[No. B219080. Second Dist., Div. Four. Aug. 24, 2010.]

JUAN PEREZ, Plaintiff and Appellant, v.
VAS S.p.A., Defendant and Respondent.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*It is ordered that the opinion in the above entitled matter be published in the Official Reports, with the exception of Discussion parts II.C.4. and III.

662

**Counsel**

Lessing C. Solov for Plaintiff and Appellant.

Sabaitis • O'Callaghan, Frank T. Sabaitis and Brad A. Byszewski for Defendant and Respondent.

OPINION

**WILLHITE, J.—**

## INTRODUCTION

Plaintiff Juan Perez was injured by a paper rewinding machine designed and manufactured by VAS S.p.A. (VAS). He sued VAS, alleging causes of action for strict products liability and negligence. In a nonjury trial, VAS asserted that its design was not defective, and that Perez and his employer engaged in an unforeseeable misuse of the machine, thereby absolving VAS of liability. The trial court agreed and entered judgment for VAS. In his appeal from the judgment, Perez raises various contentions, most notably that the trial court erred in assigning the burden of proving the absence of unforeseeable misuse to him, rather than requiring VAS to prove unforeseeable misuse. We agree that the trial court erred in failing to adhere to the applicable burden-shifting analysis, under which Perez was required to make a prima facie showing that his injury was proximately caused by the design of the rewinding machine, whereupon the burden of proof shifted to VAS to prove that Perez's use of the machine was so unforeseeable as to constitute the superseding cause of his injury. But the error was not prejudicial. Despite the court's inaccurate reference to the burden of proof, the court in fact found, supported by substantial evidence, that Perez used the machine in such an unforeseeable manner that it constituted the sole cause of his injury. Given this finding, it is not reasonably probable that had the court used the correct burden-shifting analysis, a different result would have been reached. We also find Perez's other assignments of error unpersuasive, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Perez's Injury*

In December 2005, Perez was injured while operating a paper rewinding machine for his employer, Pabco Paper. The rewinder was manufactured by VAS, an Italian company, which sold it to Pabco. His right, dominant hand was crushed when it was pulled into a "pinch point," also referred to as a "nip point," created by two cylinders which rotated toward each other on the VAS rewinder.[1] His right index finger was amputated at the knuckle, and his middle and ring fingers were also injured.

---

[1] At trial, Perez's expert defined a "nip point" as "the intersection of two parts that are moving so that they can squeeze something in those two parts as they get closer. Typically a nip point is thought of as two rotating rollers or parts where a hand or other body part can be caught."

*The Present Complaint*

Perez filed a complaint against VAS in December 2007, asserting claims for strict products liability and negligence. VAS filed an answer, and later filed an amended answer in which it alleged product misuse as an affirmative defense.

*The Court Trial*

### A. Bifurcation

VAS filed a motion to bifurcate the issues of liability and damages, and the trial court granted the motion. The matter proceeded to a court trial, held over three days in June 2009.

### B. Plaintiff's Theory of the Case

In Perez's trial brief, he asserted that the rewinder was defectively designed because it had an unguarded nip point, and that VAS was negligent per se for designing a rewinder with an unguarded pinch point in violation of title 8, section 4002, subdivision (a) of the California Code of Regulations.[2]

### C. The Evidence

Perez testified on his own behalf, and also called to testify Pabco's plant manager, William Fraser, and Kenneth Solomon, an expert in forensic engineering.

Paul Saedler, a forensic mechanical engineer, provided expert testimony on behalf of the defense.

### 1. The VAS Paper Rewinder Machine

A paper rewinder is a large industrial machine that cuts a single large roll of paper (about 105 inches in width and 74 inches in diameter, and weighing over 5,000 pounds) into two smaller rolls (each about 50 inches in width).

---

[2] That section provides: "(a) All machines, parts of machines, or component parts of machines which create hazardous revolving, reciprocating, running, shearing, punching, pressing, squeezing, drawing, cutting, rolling, mixing or similar action, including pinch points and shear points, not guarded by the frame of the machine(s) or by location, shall be guarded.

"(b) Keys, set screws, projections or recesses which create a hazard not guarded by the frame of the machine or by location shall be removed, made flush or guarded.

"Note: Section 4002 does not apply to points of operation. For point-of-operation requirements, refer to Group 8, commencing with Section 4184." (Cal. Code Regs., tit. 8, § 4002.)

The large roll of paper is placed on the rewinder machine, and the operator takes the loose end of the paper and feeds it onto a cylinder, which runs parallel to the large paper roll. This "threading" process is similar to putting film in a camera by pulling the film into the area where it is secured and then winding it up. Once the end of the paper is secured and begins winding around the empty cylinder, the operator increases the speed of the machine. As the paper unwinds from the large roll, the machine cuts the paper in half, and rewinds the cut paper onto a new cylinder.

Before purchasing the VAS rewinder machine, Pabco used an old rewinder machine; Perez began operating the old rewinder in mid-2004. He was trained on the use of the old machine by watching its operator for about one week. Both the old machine and the new VAS machine similarly made two smaller rolls out of one larger roll, and the cylinders on both machines rotated the same way.

a.  *Pabco Hires VAS to Build a New Rewinder*

William Fraser, the plant manager for Pabco, testified that he was responsible for selecting the companies that would bid on making the new rewinder machine, analyzing their proposals, and recommending which company to use. He recommended selecting VAS, based in part on prior experience with a different machine Pabco purchased from VAS. The rewinder machine was custom built for Pabco by VAS, not mass produced.

When the VAS rewinder was being installed in late 2005, two VAS employees were present at Pabco for about two weeks to assist with setting up the machine. The old machine remained in operation during that time. Fraser stated that the old machine and the VAS machine were "next to each other." Fraser said that "when we [Pabco] initially were looking at purchasing the new machine, the [VAS] personnel who were quoting it did observe the operation of the old machine." Fraser was asked by the trial court, "When the new machine was being installed, did you observe other *Pabco* employees watching it being installed, watching the preliminary operations of the matter, testing of it? Did you so observe that yourself and did you observe your fellow employees so observing that going on?" (Italics added.) He responded, "Yes."

Fraser stated that the old rewinder machine ran at half the speed of the VAS machine during the winding process, and did not have sophisticated computerized controls like the VAS machine. It had a manual feed system

that required the operator to manually feed the tail to begin the winding process. Fraser agreed that the VAS machine was a fairly sophisticated piece of machinery, and only a trained operator would be expected to use it.

The operations and maintenance handbook supplied by VAS with the rewinder specified in section 1.9.1 that the machine should be operated only by those who were trained in its use, and who had read the entire operating and maintenance instructions. The second bullet point under section 1.9.1 said: "When the machine is running, the operator must stay inside or near to the bench area and never cross the safety protections. The operator must never go near to moving or rotating parts, trying to avoid the installed safety protections. Very dangerous are the contact points between two cylinders or between a cylinder and the paper."

Section 1.9.9 described "guards, protections and safety fences." It stated, "The system is protected by guards, that avoid the accidental contact between the operator and the machine. Keep always outside the guards and never lean out during the machine running. [¶] The gates necessary to enter the machine are electronically interlocked and must be closed according to the safety features in the program that controls the machine."

b.  *The Paper Rewinding Process*

  i.  *The Threading Phase*

Perez's expert, Solomon, testified that the operations and maintenance handbook indicated that there were two operational modes, or speeds, for the VAS machine. The slower mode, also referred to as "jogging" speed, was defined in the manual as the speed to use during the tail threading process. The threading process was performed when the uncut roll was placed on the machine, and the beginning of the roll, or "tail," was threaded onto the drum onto which the cut paper would be rolled. Fraser said the tail that the operator used to thread the paper was six to 10 feet long, and was cut in a "V" shape. On the VAS machine, the threading process was accomplished with the assistance of air showers and belts, which served to feed the paper tail onto the drum without the operator having to reach in close to the nip point.

Section 1.9.3 of the operating manual set forth the tail threading procedure. It stated, "During the tail threading it is necessary to pay attention to the NIP points. In order to increase the safety level of this operation, VAS installed a system that helps feeding the tail using a set of air showers and belts. This

system allows the paper to be easily threaded and fed into the drums. This is anyway one of the most dangerous operations in running a paper machine, so it is necessary to be always very careful during the tail threading. Be especially careful in feeding the tail through the slitting system: the knives are very sharp!" This was the only portion of the manual that contemplated having an operator in the danger zone where the nip point was located when the machine was in motion.

Section 1.9.10 of the operating manual discussed the "e-cable" or "wire safety switch." It stated: *"In the paper threading procedure*, when the paper reaches the drums, the main danger is the possible squashing/dragging into the NIP between the drums and the cores. To immediately stop the paper threading and the rotation of the drums, a wire safety switch has been installed on the cradle. The switch can easily be activated with the legs of the operator. To thread again the paper, it is necessary to reset the switch."* (Italics added.)

### ii. *The Operations Phase*

At full operating speed, the mode in which the machine cut and rewound the paper onto another cylinder, the VAS machine moved the paper at a rate of 83 feet per second. When operating at that speed, the machine had a gate or cradle-type device that lifted and completely guarded the roller, preventing a worker from accessing the rollers. There was also an electronic laser fence that guarded the roller during full operating speed; if the light beam was interrupted by a worker entering the area, the machine automatically stopped rotating. The manual indicated that the operator should leave the work area to operate the control panel in order to run the machine. In contrast, when the machine was operating in the jogging mode used for the threading procedure, the cradle guard and laser fence did not guard the machine. Fraser considered both the threading phase and the operations phase to be safe to perform on the VAS machine.

After completion of the operations phase, the manual indicated that the cut rolls were to be ejected, by means of their being lowered to the ground in the cradle that had been positioned in front of the rollers to block the nip point while the machine was running at operating speed. The operator was not to be in the operations area while the rolls were being ejected.

### iii. *Pabco's Finishing Process*

On both the old rewinder and when he first operated the new VAS machine, when the cutting and rewinding process was completed, Perez would cut off any damaged paper at the end of each roll with a utility knife.

With the machine stopped, he would then tape the end of the roll to prevent the paper from unwinding. Next, he taped the end of a roll of thin plastic to the paper roll on the far left side, and turned the machine on at jogging speed. As the paper roll rotated, he slowly moved to his right while holding the roll of plastic in front of him, and the rotation of the paper rolls caused the plastic to wrap around the paper rolls. When the paper rolls were fully wrapped, he tore the end of the plastic and stopped the machine. With the machine again moving at jogging speed and standing at the middle of the paper rolls (where the machine had cut the larger roll in two), he then used a utility knife to cut the plastic in order to separate the two rolls. Finally, he put hard plastic bands around the plastic-wrapped paper rolls. All of this was done while the rolls were still on the machine. The old machine also had a nip point, but it was lower than on the VAS machine, although still within an operator's reach.

On the VAS machine, when the high-speed cutting and rewinding was finished, the machine would stop. Perez stated that prior to being injured, he lowered the cradle guard and then made the machine run at jogging speed in order to wrap it in plastic.

Perez's expert, Solomon, stated that putting plastic on the finished rolls and then cutting them was part of the usual and customary procedure at Pabco. He agreed that the operating manual did not contain any information regarding wrapping the finished paper in plastic. Solomon did not find any documentation or communication by VAS to Pabco concerning the use of the VAS machine for wrapping the finished paper in plastic.

No one at VAS told Fraser at any time that it was improper to use the machine to perform the finishing process. Fraser agreed that there was nothing in the operations manual or elsewhere in writing about putting plastic wrap on the paper rolls. Fraser confirmed that wrapping the finished rolls in plastic was part of Perez's job assignment prior to the accident.

## 2. The Accident

On the date of the accident, December 12, 2005, the VAS machine had been installed for about two days. When the accident occurred, Perez was operating the old machine and the VAS machine at the same time. Before using the VAS machine, he did not receive any training, or review any manuals or written materials.[3] He watched a coworker use the VAS machine

---

[3] Perez could not read or speak English. He testified with the assistance of a Spanish-language interpreter.

for 15 to 20 minutes, including the finishing process, before he started using it. At his deposition, Perez said the first time he used the VAS machine, he almost could not operate it. He approached using the VAS machine as he had the old machine. No one at Pabco explained to him the differences between the old and new machines.

The first time Perez used the VAS machine, he successfully performed the whole procedure on one roll, including taping and wrapping the two cut rolls in plastic. On the second run, when he tried to cut the plastic to separate the two rolls, the accident occurred. The utility knife he was using to cut the plastic became entangled with the plastic, and it pulled his hand down into the nip point.

### 3. *The Cal-OSHA Investigation*

California's Division of Occupational Safety and Health (Cal-OSHA) investigated the accident. Perez was interviewed by a representative of Cal-OSHA. At trial, Perez did not recall whether he told Cal-OSHA that the distance from the knife to the nip point was about 10 inches. He later testified that he recalled stating at deposition that he put the blade of his utility knife about three-quarters of an inch from the pinch point.

Fraser spoke to a representative of Cal-OSHA but he could not recall if he described to that person Pabco's practice of wrapping the finished rolls in plastic and cutting.

Cal-OSHA cited Pabco for a "serious" violation, concluding that "[t]he pinch points created between the revolving paper roll and the in-running roller and between the revolving paper roll and the frame of the machine were not guarded as required by [California Code of Regulations, title 8, section 4002, subdivision (a)]."

### 4. *Pabco's Post-accident Changes in Its Finishing Process and to the VAS Machine*

After Perez's accident, Pabco reversed the direction of the rotation of the drums on the VAS machine, which eliminated the nip point involved in Perez's accident. Doing so created a new nip point up higher, at a height of nine feet seven inches, which was out of reach of the operator. Plant manager Fraser stated that "[b]y running the rewinder the opposite direction, it changes the nip from an incoming to an outgoing." The nip point was moved to the rider roll on top. Reversing the direction of the roll caused the outer wrap of the paper roll to be distorted, detracting from the appearance of the finished product, but had no other effect. The VAS machine operated as

efficiently as it had before. The change in direction of the roll was accomplished in less than one week by a company in Italy that worked for VAS, by remotely reprogramming the "PLC." Fraser did not know if any expense was involved in having that done. Fraser did not believe that changing the roll direction created any danger during the threading process that was not present before.

In addition, a few days after Perez's accident, Pabco stopped wrapping plastic around the paper by using the rotation of the machine. Pabco continued to cut the loose ends of the paper to leave a straight edge after the roll was divided into two separate rolls, and to tape the loose paper edge to the roll, while the rolls were still on the VAS machine (both activities were performed with the machine stopped). Pabco also continued to wrap the finished rolls in hard plastic bands, while the rolls were still on the VAS machine, with the machine moving at jogging speed. The banding process brought the operator into the vicinity of where the pinch point used to be. Pabco no longer wrapped the finished roll in plastic film on the machine. Asked what dictated the decision to stop using plastic wrap, Fraser replied that "we looked at all the factors that contributed and decided that having to use the utility knife and the way it was being used was part of it and that was because of the plastic. So we decided to stop the plastic."

Fraser stated that after doing a bulk rewind of a paper roll, some type of finishing process had to be done. When asked if "[s]omething has to be done in order to put them in condition to be moved off the machine and further processed" he replied, "Typically, yes, depending upon what you're doing with the rolls after."

When Perez returned to work at Pabco six months after the accident, he received training on the use of the VAS machine from a coworker for about six weeks, but he never reviewed any written material or manual in connection with his training. He still cut the damaged paper off and taped the end when the two rolls were still on the machine, but he did not wrap the rolls in plastic. He confirmed that he placed the hard plastic bands around the rolls while they were still on the machine.

5. *Kenneth Solomon's Expert Opinions*

Solomon stated that in forming his opinions he reviewed Perez's and Fraser's depositions, the operations and maintenance handbook for the VAS machine, and the report prepared by Cal-OSHA. A physical inspection of the VAS machine was done by a member of Solomon's staff, who took photographs and measurements.

Solomon noted the regulation, California Code of Regulations, title 8, section 4002, subdivision (a), which Cal-OSHA cited when it investigated the

circumstances surrounding Perez's accident. He stated that Cal-OSHA found that the direction of rotation of the drum was problematic. Cal-OSHA also cited the fact that the nip point was unguarded by the gate device or the light beam curtain, noting that the nip point was at the height of three feet seven inches, where an operator's hand could reach it. Cal-OSHA did not criticize Pabco for wrapping the finished paper in plastic, or for using a utility knife to cut the plastic to separate the two finished rolls.

Solomon opined that there was a defect in the design of the machine because during the slow-speed operation, there was no physical barrier to the nip point, there was no optical curtain barrier to the nip point, and the direction of the drum allowed the nip point to be at a height of three feet seven inches off the ground, which is comparable to the positioning of an operator's arm or hand. Solomon stated that there was no reason why the same physical barrier and light beam curtain could not be used with the machine running at slow speed.

Solomon did not regard the practice of applying plastic to the finished rolls, as Pabco did, to be a misuse of the VAS machine. At his deposition he stated that in addition to a machine's desired or intended purpose, the designer of a machine had to account for the manner in which an operator could misuse the machine in a predictable manner other than for its intended purpose and determine if the danger created by the misuse could be reasonably guarded against. He opined that the manner in which Perez used the machine could have been predicted, even though he agreed that it was not a contemplated use of the machine. He said that designers of machines should assume that an operations manual might not be thoroughly read or understood by the end user, and that an operator might not receive adequate training on use of the machine. At trial, however, he stated that he could not say that the VAS machine was not designed to wrap rolls in plastic because it was capable of performing that function and, therefore, he could not say it was not designed to do it.

Solomon discussed at his deposition the fact that reversing the rotational direction of the cylinders or drums on the machine eliminated the nip point at issue, but he did not discuss at deposition the cost associated with doing so. Accordingly, Solomon was not permitted to testify regarding the costs associated with reversing the direction of the rollers.

Solomon noted that there was an emergency stop cable on the VAS machine in the vicinity of where Perez was working when he was injured, at ground level in front of the cylinder. Solomon stated that its existence indicated that the manufacturer of the machine contemplated that people would be working in front of the moving drum.

Defense counsel asked, "If an operator operating this machine follows the procedures and the safeguards as set forth in the manual, that operator can operate this machine safely?" Solomon replied, "I wouldn't say completely. There are modes of operation which are not discussed in the manual." At his deposition, Solomon referred to different phases of operation, the first one being the threading phase, in which he found no design defect if the machine were operated in accordance with the manual. Solomon testified at trial that the second phase, involving unwinding and cutting the paper, was also safe when done in accordance with the instructions in the manual.

Solomon stated at his deposition that the operating manual set forth the intended and expected safe operations of the machine. At trial, however, he said that would be a correct statement for two of the three phases, but not the third phase. At deposition, defense counsel had asked if the manual included "the four corners of the operations and safe handling procedure vis-à-vis this machine," and Solomon responded in the affirmative. At trial, however, he said that the manual was intended to be comprehensive in describing safe operation, but in fact it was not comprehensive. It did not discuss the operator cutting plastic near the nip point, either to describe or prohibit such use. What he referred to as "phase three" was not set forth in any way in the manual.

Solomon initially stated that the operating manual did not discuss what was to be done with a finished paper roll after it was cut and the machine had been stopped, leaving the finished rolls with loose ends. However, defense counsel pointed out, and Solomon agreed, that the manual specified that the next thing that was to be done was ejection of the finished roll.

Section 4 of the operating manual, entitled "description and operation" stated: "The winder section is designed to wind the paper web from the unwind into finished rolls. When the spool is empty on the unwind stand, the roll ejector eject[s] the finished roll from the drums on the cradle. [¶] Using a set of showers and threading devices, the sheet is again introduced, the rider roll lower and a new set of finished rolls can be done."

Solomon agreed that in order to wrap the finished rolls in plastic and cut the plastic to separate them, Perez had to eliminate the guards that were present in the operations phase by stopping the machine, which caused the cradle to be lifted and the light beam to be disabled. Perez also had to go through a gate-type barrier to approach the machine. Solomon pointed out that the rotational direction was not altered or alterable by Perez. He stated that reversing the rotation of the drums provided an additional guard by virtue of changing the location of the nip point so it was well out of reach of the operator. The fact that when the guards were bypassed the machine still operated was another important factor. Solomon agreed that Perez, in order to

engage in the "phase three" wrapping procedure, had to turn the jogging speed back on so that it was as used during the threading procedure.

Solomon agreed that the VAS machine had various signage that warned of dangers associated with its use, but opined that it was not sufficient to simply use warnings to mitigate danger posed by machinery where those risks could be removed by designing them out.

6. *Paul Saedler's Expert Opinions*

Paul Saedler, a forensic mechanical engineer, provided expert testimony for the defense. He inspected the VAS machine on two occasions, and took a series of pictures of the machine. Saedler did not see or inspect the old machine. Saedler reviewed the operations handbook and drawings of the VAS machine, read the depositions of Perez, Fraser, and Solomon, and read the Cal-OSHA investigation documents.

Saedler concluded that there were no defects or malfunctions of the safety equipment which would have caused or contributed to Perez's injury. The machinery was equipped with proper safeguarding and warning signs. He stated that the process of wrapping plastic around a finished spool of paper and cutting it with a utility knife while the rolls were in motion was not a process that was specified in the equipment operation manual. He noted that the manual stated that when the machine was running the operator must never cross the safety precautions and must never go near moving or rotating parts. He opined that had Perez been trained and the manual followed correctly, the injury would not have occurred. Given that the machine was a sophisticated piece of industrial equipment, he stated that it would be assumed and was predictable that the operator would be familiar with the equipment. The manual provided that training was critical to achieving a safe process, in accordance with basic OSHA standards of machine guarding. Saedler was aware Pabco was cited for violating California Code of Regulations, title 8, section 4002, subdivision (a), regarding unguarded pinch or nip points.

Saedler disagreed that reversing the direction of the rolls made the equipment safer, because the reversal was unnecessary in that the equipment was properly safeguarded if the operations manual were followed. He stated that by reversing the direction of rotation of the rolls, a new nip point was created at the back of the machine. Saedler said an operator could potentially get back there, noting that there was no emergency cable on that side of the VAS machine.

Saedler did not know what needed to be done to a roll of paper after it was finished being cut on the machine. He stated that wrapping the finished roll in

plastic and cutting the plastic was inappropriate because the manual did not provide for that. He thought the manufacturer did not foresee the process that Pabco developed of wrapping plastic around the finished rolls and cutting the plastic with a utility knife. Once the paper was transferred over, the process was completed and the roll was to be ejected. It was not an anticipated or reasonably foreseen function that the VAS machine would then be used to perform a finishing process, including wrapping the roll in plastic. Applying plastic to the finished rolls could occur after the rolls were ejected as directed in the manual. He noted that, after the accident, Pabco no longer wrapped the rolls in plastic and therefore also stopped cutting plastic on the VAS machine. Saedler testified that this indicated that doing so was not an integral part of operating the machine.

Saedler inspected the VAS machine in 2008, long after the accident occurred, so he could not confirm that the warning signs were in place at the time of the accident. He noted that Cal-OSHA did not raise any issue about a lack of warning signs.

*The Statement of Decision*

The trial court found that Perez had the burden of proving that the new rewinding machine was used or misused in a way that was reasonably foreseeable to VAS, and concluded that Perez failed to prove the absence of unforeseeable misuse. The court stated that the Directions for Use for CACI No. 1204 "essentially maintain that proving the absence of unforeseeable misuse is an element that is a given plaintiff's burden in design defect cases in California."

"Perez strained to adduce any evidence that the VAS design of the rewinding machine contemplated finishing practices comparable to those engaged in by Pabco workers over the years with its 'old' rewinding machine. But nothing in the VAS Manual addressed any finishing process, let alone the so-called 'finishing process' that evidently evolved through ad hoc practice(s) of successive rewinding machine operators at Pabco. Nothing in writing existed even at Pabco with respect to such practice(s)." The court continued: "[T]he evidence substantially showed that Pabco's machine operators, including Perez, simply did not use the machine in the way it was designed and intended to be used by VAS. Instead, the new rewinding machine was used in virtually the same way that Pabco's machine operators used the 'old' machine, especially with respect to the unsafe practices that had developed only to wrap the paper rolls produced by the machine in plastic. Such wrapping practices by Perez and the other machine operators and facilitated by Pabco's scant, if any, training of them may be likened to the figurative square peg being pounded by Pabco and its operators into the round hole of

the VAS machine design aimed at minimizing machine operator interaction with the new rewinding machine. [¶] The VAS machine design afforded, its rewinding machine fostered and the VAS Manual invoked much less interaction between the machine and its operators than had been practiced by Pabco and/or its machine operators with its 'old' machine. Neither Pabco nor its machine operators, including Perez, meaningfully complied with the VAS Manual and warnings on the machine itself."

The court concluded that the practice engaged in by Perez, and encouraged by Pabco, of wrapping the finished rolls in plastic, thus placing the operator in close proximity to the machine in a manner contrary to the manual, "constituted unforeseeable misuse by [Perez and Pabco]. Perez failed to prove absence of unforeseeable misuse in the circumstances resulting in his injury. He did not use the machine 'in a way it was intended to be used,' as well as designed to be used. [Citations.] Dr. Solomon's vacuous opinion to the contrary [citation], lacked credence. [Citation.]"

As to the negligence cause of action, the court found that "the unforeseeable misuse of the rewinding machine by Perez, which was clearly countenanced by Pabco, also essentially vitiate[d] such negligent design theory of recovery against VAS. Various decisional authorities reflect the view that strict products liability and negligence claims based on design defect essentially merge."

The court rejected Solomon's trial testimony that there was a design defect in the VAS machine because the safety devices designed for use during the machine's high-speed operational process were not also designed for use during the machine's jogging speed. Having the cradle in front of the moving cylinders would prevent threading from taking place, rendering the machine useless. The court noted that Solomon's testimony at trial was impeached by his deposition testimony.

Citing *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 71 [74 Cal.Rptr.3d 108, 179 P.3d 905], the court also found that Pabco and its machine operators, including Perez, were "sophisticated users."

The court "recognize[d] that VAS owed a duty of care to Perez to exercise reasonable care in its design of the subject rewinding machine so that it could be safely used 'in the way it was intended to be used.' *Greenman v. Yuba Power Products, Inc.* [(1963)] 59 Cal.2d [57,] 64 [27 Cal.Rptr. 697, 377 P.2d 897]. The court [found] that VAS so exercised its duty of reasonable care in the design of the subject rewinding machine and that it was Perez's unforeseeable misuse of such machine, largely abetted by Pabco, that caused his injury."

## DISCUSSION

### I. Burden of Proof in Products Liability Based on Defective Design

Perez contends that the trial court erred in assigning the burden of proof to him to prove the absence of unforeseeable misuse. We agree, but find the error not prejudicial. We begin by reviewing the relevant law of products liability.

### A. *The Risk-benefit Test for Determining Defective Design*

■ The elements of a strict liability, design defect claim were set forth in *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430–432 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*). In that case, our Supreme Court explained that a product can be found defective under one of two tests: the consumer expectations test, or the risk-benefit test. Under the consumer expectations test, a product is defective in design if the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. (*Ibid.*) Alternatively and as applicable here, under the risk-benefit test, a product is defective in design if the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.[4] (*Barker*, at pp. 430–432; see also *Moreno v. Fey Manufacturing Corp.* (1983) 149 Cal.App.3d 23, 26–27 [196 Cal.Rptr. 487].)

"[A] product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design. [Citations.] [¶] A review of past cases indicates that in evaluating the adequacy of a product's design pursuant to this latter standard, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

[4] As the trial court noted, the parties agreed that the risk-benefit test is the appropriate one to use in this case. In its statement of decision, the trial court likened the VAS rewinder to the commercial cotton picker in *Bates v. John Deere Co.* (1983) 148 Cal.App.3d 40, 52 [195 Cal.Rptr. 637], regarding which the appellate court stated that "it [was] difficult to conceive that an ordinary consumer would know what to expect concerning the safety design of a commercial cotton picker."

[Citations.]" (*Barker, supra,* 20 Cal.3d at pp. 430–431, fn. omitted; see also *Gonzalez v. Autoliv ASP, Inc.* (2007) 154 Cal.App.4th 780, 786 [64 Cal.Rptr.3d 908]; CACI No. 1204.)

## B. *The Allocation of the Burden of Proof*

A primary point of contention in this case involves VAS's assertion that the finishing process in which Perez was engaged when he was injured constituted such a flagrant misuse of the VAS rewinder that VAS should be relieved of liability for his injury. The trial court determined that the finishing process was indeed an unforeseeable misuse of the VAS rewinder. On appeal, Perez contends that the judgment in favor of VAS should be reversed because the trial court erred in its belief that Perez had the burden of proving the absence of an unforeseeable misuse.[5] He asserts that instead VAS was required to prove that the finishing process constituted an unforeseeable misuse of the VAS rewinder.

▉ We agree that the trial court misstated the applicable burdens. As stated in *Barker*: "Although our cases have thus recognized a variety of considerations that may be relevant to the determination of the adequacy of a product's design, past authorities have generally not devoted much attention to the appropriate allocation of the burden of proof with respect to these matters. [Citations.] The allocation of such burden is particularly significant in this context inasmuch as this court's product liability decisions, from *Greenman* [*v. Yuba Power Products, Inc., supra,* 59 Cal.2d 57] to *Cronin* [*v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153]], have repeatedly emphasized that one of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action. Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard[,] e. g., the feasibility and cost of alternative designs[,] are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, *we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective.* Moreover, inasmuch as this conclusion flows from our determination that the

[5] VAS argues on appeal that Perez failed to argue below that the court incorrectly assigned the burden of proof regarding absence of unforeseeable misuse to him, and therefore he has waived his right to make this argument on appeal. However, because the assignment of the burden of proof constitutes legal error appearing on the face of the statement of decision, we conclude that he has not forfeited the contention. (See *United Services Auto. Assn. v. Dalrymple* (1991) 232 Cal.App.3d 182, 186 [283 Cal.Rptr. 330].)

fundamental public policies embraced in *Greenman* dictate that a manufacturer who seeks to escape liability for an injury proximately caused by its product's design on a risk-benefit theory should bear the burden of persuading the trier of fact that its product should not be judged defective, *the defendant's burden is one affecting the burden of proof, rather than simply the burden of producing evidence.* [Citations.]" (*Barker, supra,* 20 Cal.3d at pp. 431–432, italics added.)

The court continued: "[W]e believe that the test for defective design set out above is appropriate in light of the rationale and limits of the strict liability doctrine, for it subjects a manufacturer to liability whenever there is something 'wrong' with a product's design—either because the product fails to meet ordinary consumer expectations as to safety or because, on balance, the design is not as safe as it should be—while stopping short of making the manufacturer an insurer for all injuries which may result from the use of its product. This test, moreover, explicitly focuses the trier of fact's attention on the adequacy of the product itself, rather than on the manufacturer's conduct, and places the burden on the manufacturer, rather than the plaintiff, to establish that because of the complexity of, and trade-offs implicit in, the design process, an injury-producing product should nevertheless not be found defective." (*Barker, supra,* 20 Cal.3d at p. 432.)

■ Under *Barker*, in short, the plaintiff bears an initial burden of making "a prima facie showing that the injury was proximately caused by the product's design." (*Barker, supra,* 20 Cal.3d at p. 431.) This showing requires evidence that the plaintiff was injured *while using the product in an intended or reasonably foreseeable manner* and that the plaintiff's ability to avoid injury was frustrated by the absence of a safety device, or by the nature of the product's design. (See *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 125–126 [184 Cal.Rptr. 891, 649 P.2d 224].) If this prima facie burden is met, the burden of proof shifts to the defendant to prove, in light of the relevant factors, that the product is not defective. Importantly, the plaintiff's prima facie burden of producing evidence that injury occurred while the product was being used in an intended or reasonably foreseeable manner must be distinguished from the ultimate burden of proof that rests with the defendant to establish that its product was not defective because the plaintiff's injury resulted from a misuse of the product.[6]

---

[6] In concluding that plaintiff had to prove the absence of unforeseeable misuse, the trial court relied on former Directions for Use for CACI No. 1204. Those directions stated: "Some cases state that product misuse must be pleaded as an affirmative defense. [Citation.] However, the advisory committee feels that *absence of unforeseeable misuse is an element of plaintiff's claim* and that foreseeable misuse is more properly asserted by defendant in support of a claim of contributory negligence." (Judicial Council of Cal., Civ. Jury Instns. (2009) Directions for Use for CACI No. 1204, p. 659, italics added.) However, in April 2009 (two months before the

Here, Perez met his initial prima facie burden. Through Solomon's expert testimony, he presented evidence that his injury occurred because his hand was caught in a nip point of the VAS rewinder, which was located within his reach. Solomon's testimony also suggested that the finishing process used by Perez to wrap the cut rolls in plastic was a foreseeable use of a paper rewinding machine.

■ Given Perez's showing, the burden of proof shifted to VAS to prove that its design was not defective, and in particular, to prove that Perez's injury resulted from a misuse of the machine. It is true that the trial court did not use this burden-shifting formula. However, "misallocation of the burden of proof is not 'reversible error *per se*,' [and] does not vitiate the substantial evidence rule . . . ." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736 [43 Cal.Rptr.3d 181].) To the contrary, "an error in allocating the burden of proof must be prejudicial in order to constitute reversible error." (*Id.* at p. 738.) Here, there is no reasonable probability that the result would have been different had the court used the burden-shifting analysis, because the trial court expressly found that the credible evidence established that the finishing process was an unforeseeable misuse of the VAS rewinder—in substance, a superseding cause of injury. Because substantial evidence supports the trial court's conclusion, we affirm the order. (See *id.* at p. 738.)

## II.  Substantial Evidence

### A.  *Product Misuse as Superseding Cause*

Before discussing the trial court's findings and supporting evidence, we review the principles of product misuse as a superseding cause of injury, as it applies to relieve VAS of liability.

VAS contends on appeal, as it did in the trial court, that it cannot be held liable for any design defect because the accident was attributable to the

trial here), the CACI advisory committee substantially revised the Directions for Use accompanying CACI No. 1204. As revised, they stated that "Product misuse is a complete defense to strict products liability *if the defendant proves that an unforeseeable abuse or alteration of the product after it left the manufacturer's hands was the sole reason that the product caused injury.* (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 56 [148 Cal.Rptr. 596, 583 P.2d 121].) See CACI No. 1245 [(new as of Apr. 2009)], *Affirmative Defense—Product Misuse or Modification.* Unforeseeable misuse or modification that was a substantial factor in, but not the sole cause of, plaintiff's harm may also be considered in determining the comparative fault of the plaintiff or of third persons. See CACI No. 1207A, *Strict Liability—Comparative Fault of Plaintiff,* and CACI No. 1207B, *Strict Liability—Comparative Fault of Third Person.*" (Judicial Council of Cal., Civ. Jury Instns. (Apr. 2009 supp.) Directions for Use for CACI No. 1204, pp. 70–71, some italics added; see also CACI No. 1245, added Apr. 2009.) The Directions for Use were revised again in December 2009 to delete the word "unforeseeable" from the beginning of the second sentence. (Judicial Council of Cal., Civ. Jury Instns. (2010) Directions for Use for CACI No. 1204, p. 688.)

misuse of the rewinder by Pabco and Perez. In order to avoid liability for product defect, VAS was required to prove, as an affirmative defense, that Pabco's and Perez's misuse of the machine, i.e., performing the finishing process on the VAS machine while it was running at jogging speed, was an unforeseeable, superseding cause of the injury to Perez.

Perez demonstrated at trial that the design of the VAS rewinder created a nip point in a location within his reach, which was accessible while the machine was running at jogging speed, and that he was injured when his hand entered that nip point. He further demonstrated that the machine could have been designed such that the rollers turned in the opposite direction (outward), with the result that the nip point where Perez was injured no longer existed, but instead was moved to a location higher up on the VAS rewinder. Indeed, the rewinder was reprogrammed to do just that shortly after Perez's accident, with little negative effect on the finished paper rolls. Thus, Perez carried his burden of showing that the design of the VAS rewinder was a causative factor in his injury. Nonetheless, even if Perez's injuries were attributable in some measure to the machine's design, VAS argued that the use of its rewinder to perform the finishing process was such a flagrant, unforeseeable misuse of the rewinder that it should be absolved of liability.

■ "[T]he defense of 'superseding cause . . .' . . . absolves a tortfeasor, even though his [or her] conduct *was* a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible. (See *Doupnik* v. *General Motors Corp.* [(1990)] 225 Cal.App.3d 849, 863 [275 Cal.Rptr. 715]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 975–976, pp. 366–367; Rest.2d Torts, . . . § 440.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

" 'A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' (Rest.2d Torts, § 440.) In California the doctrine requires more than mere negligence on the part of the intervening actor. '[T]he fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable man knowing the situation existing when the act of the third person is done would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation

created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent.' (*Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863–864 [13 Cal.Rptr. 521, 362 P.2d 345].)" (*Doupnik v. General Motors Corp., supra*, 225 Cal.App.3d at p. 863.)

However, "[t]hird party negligence which is the immediate cause of an injury may be viewed as a superseding cause when it is so highly extraordinary as to be unforeseeable. (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 411 [131 Cal.Rptr. 69, 551 P.2d 389]; *Stewart* v. *Cox*[, *supra*,] 55 Cal.2d [at p.] 864 . . . .) 'The foreseeability required is of the *risk of harm*, not of the particular intervening act. In other words, the defendant may be liable if his conduct was "a substantial factor" in bringing about the harm, though he neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred.' (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 976, p. 367.) It must appear that the intervening act has produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' (*Soule* v. *General Motors Corp., supra*, 8 Cal.4th at p. 573, fn. 9.)" (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18–19 [56 Cal.Rptr.2d 455].)

For example, in *Balido v. Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633 [105 Cal.Rptr. 890] (*Balido*), disapproved on another point in *Regents of University of California v. Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624 [147 Cal.Rptr. 486, 581 P.2d 197], the plaintiff appealed after the trial court entered judgment of nonsuit in favor of the manufacturer of a punch press machine on which the plaintiff was injured during the course of her employment. The press contained a lift safety gate, which covered the operating area of the press when it was fully closed. The first owner of the press added an additional safety feature, an electric limit switch which activated the press when triggered by the closing of the safety gate. (*Balido, supra*, 29 Cal.App.3d at p. 638.) However, the press still did not meet California industrial safety standards. The plaintiff's employer purchased the press from its first owner in that condition. Thereafter, the manufacturer of the press contacted the plaintiff's employer on several occasions, offering for sale additional safety equipment that would bring the press into compliance with the law, but the employer did not install any other safety devices. The plaintiff lost several fingers when the press was accidentally activated as she reached in to adjust the press plates. The manufacturer conceded at trial that the safety devices on the press were inadequate and ineffective, but argued that the press owner's disregard of its safety warnings was a superseding cause of the injury that legally relieved the manufacturer from liability for its defective design of the

press. (*Id.* at p. 644.) The trial court agreed and granted nonsuit in favor of the manufacturer, finding that the employer's knowing disregard of the industrial safety order introduced an unforeseeable element that amounted to a legally superseding cause of the accident; the manufacturer's defective design ceased to be a proximate cause. (*Ibid.*)

■ The appellate court reversed the grant of nonsuit, holding that the trial court erred in granting nonsuit because the determination of whether the press owner's disregard of the manufacturer's safety warnings was a superseding cause of the injury that legally relieved the manufacturer from liability could not be decided as a matter of law. Rather, it was a question of fact, to be decided by a trier of fact. (*Balido, supra,* 29 Cal.App.3d at pp. 645, 647–648.) In discussing the circumstances under which responsibility is shifted from one wrongdoer to another, the appellate court quoted the Restatement Second of Torts, section 452, subdivision (2), comment f, as follows: " 'It is apparently impossible to state any comprehensive rule as to when such a decision [shift of duty] will be made. Various factors will enter into it. Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations. The most that can be stated here is that when, by reason of the interplay of such factors, the court finds that full responsibility for control of the situation and prevention of the threatened harm has passed to the third person, his failure to act is then a superseding cause, which will relieve the original actor of liability.' " (*Balido,* at p. 645.) In weighing these factors, "the extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact." (*Ibid.*) Because a trier of fact *might* have concluded that the manufacturer had not done everything reasonably within its power to prevent injury to the plaintiff, the court reversed the judgment of nonsuit in favor of the manufacturer. (*Id.* at p. 649; accord, *Torres v. Xomox Corp., supra,* 49 Cal.App.4th at p. 19 ["Superseding cause has been viewed as an issue of fact even in cases where 'safety neglect' by an employer has increased the risk of injury [citation], or modification of the product has made it more dangerous [citation]."].)

## B. *The Trial Court's Findings*

Here, acting as the trier of fact, the trial court determined that the misuse of the VAS rewinder by Pabco and Perez could not be imputed to VAS. It found as follows: "[T]he evidence substantially showed that Pabco's machine operators, including Perez, simply did not use the machine in the way it was designed and intended to be used by VAS. Instead, the new rewinding

machine was used in virtually the same way that Pabco's machine operators used the 'old' machine, especially with respect to the unsafe practices that had developed only to wrap the paper rolls produced by the machine in plastic. Such wrapping practices by Perez and the other machine operators and facilitated by Pabco's scant, if any, training of them may be likened to the figurative square peg being pounded by Pabco and its operators into the round hole of the VAS machine design aimed at minimizing machine operator interaction with the new rewinding machine. [¶] The VAS machine design afforded, its rewinding machine fostered and the VAS Manual invoked much less interaction between the machine and its operators than had been practiced by Pabco and/or its machine operators with its 'old' machine. Neither Pabco nor its machine operators, including Perez, meaningfully complied with the VAS Manual and the warnings on the machine itself. [¶] The evident persistence of the machine operators, including Perez, in unsafe practices that were at a minimum tolerated or acquiesced in by Pabco cannot reasonably and fairly be imputed to the VAS design and/or its rewinding machine. The evidence showed that, contrary to the Manual and any safe and sound practice with respect to the machine's two specific operational modes, Perez and his fellow machine operators introduced and used plastic wrapping in the rewinding machine and its operating field. Paper and paper rolls were the material that the machine was designed and intended to process, not plastic material. They also used short utility knives with markedly shorter effective blades and exposed their hands, limbs and body parts in close proximity to rotating paper rolls on and metal cylinders of the machine in a variety of ways in which the machine was not designed or intended to be used, again contrary to the Manual and any safe and sound practice with respect to the machine operational modes. In so doing, the machine operators, including Perez, and their helpers physically moved, maneuvered and walked about in close proximity to the machine and in its operating field, especially and regularly while handling an essentially foreign and unwieldy plastic material that they affixed to paper rolls also rotating in the machine. The foregoing activity by Perez, which was at least tolerated, if not permitted and even encouraged, by Pabco constituted unforeseeable misuse by each of them."

## C.   *Substantial Evidence in Support of the Findings*

Perez raises various challenges to the sufficiency of the evidence to support the trial court's findings. None is persuasive. Of course, in determining whether substantial evidence supports the trial court's decision, we apply well-settled principles. " ' "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is

without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." [Citation.] The substantial evidence standard of review is applicable to appeals from both jury and nonjury trials. [Citation.]' " (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489 [21 Cal.Rptr.3d 36], italics omitted.)

### 1. *VAS's Purported Observation of the Finishing Process*

Perez contends that the court erred by ignoring purportedly uncontradicted evidence that VAS was aware that Pabco performed its finishing process on the cut paper rolls but failed to design the machine in a way that would allow that process to be safely accomplished (and therefore the finishing process could not have been an unforeseeable misuse.) Contrary to Perez's contention, there was no proof of this purported fact. Fraser testified merely that "when we [(Pabco)] initially were looking at purchasing the new machine, the [VAS] personnel who were quoting it did observe the operation of the old machine." In addition, when the VAS rewinder was being installed, two VAS employees were present at Pabco for about two weeks to assist with setting up the machine, and the old machine remained in operation nearby during that time. Perez did not offer any testimony that VAS representatives specifically observed any aspect of the finishing process being done on the old machine, at any time. There was no dispute that the operating manual prepared by VAS made no mention of use of the rewinder to perform the finishing process. Instead, it specifically instructed the operator to eject the finished rolls after they were cut and before entering the operating area. Based on this evidence, the trial court reasonably concluded that the finishing process was not a use of the VAS rewinder that was actually foreseen by VAS.

### 2. *Misuse as the Sole <u>or</u> Superseding Cause of Injury*

Perez further contends that even assuming the misuse of the rewinder was unforeseeable, such misuse did not constitute a complete defense to liability. Rather, according to Perez, the misuse was not the sole cause of his injury and the court was required to apply comparative fault principles. Perez relies on a statement made in *Campbell v. Southern Pacific Co., supra,* 22 Cal.3d at page 56 ("product misuse [is] a defense to strict products liability only when the defendant prove[s] that an unforeseeable abuse . . . of the product [is] the *sole* reason that the product caused an injury"). He also cites CACI No. 1245, which states that to succeed on the affirmative defense of product misuse, a defendant must prove among other things "that the misuse was the sole cause of plaintiff's harm."

However, as recognized in the Directions for Use for CACI No. 1245, product misuse may serve as a complete defense when the misuse "was so unforeseeable that it should be deemed the sole *or* superseding cause." (Italics added.) As the Supreme Court made clear in *Soule v. General Motors Corp., supra*, 8 Cal.4th at page 573, footnote 9: "[T]he defense of 'superseding cause . . .' . . . absolves a tortfeasor, *even though his [or her] conduct was a substantial contributing factor*, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible. [Citations.]"[7] (Italics added.) Here, the trial court reasonably concluded, in substance, that Perez's misuse of the rewinder was so extreme as to be the sole cause of his injury. That conclusion dispensed with the need to apply principles of comparative fault.

### 3.  *The Availability of a Feasible Alternative Design*

■  Further, the availability of an apparently safe and feasible alternative design, by reversing the direction of the rollers, did not dictate the conclusion that Perez's misuse of the machine was foreseeable. "[T]he determination of design defect does not turn *solely* on the existence of a safer alternative design. Rather, the determination requires balancing various factors, which include feasible alternatives, but which also include other factors, such as the gravity of danger and the likelihood that the product will cause harm." (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1512 [65 Cal.Rptr.2d 266].) The trial court here undertook that balancing of factors, including the availability of an alternative design, and decided as a factual matter that on balance the practice engaged in by Pabco was an extraordinary and obvious misuse of the VAS machine, and therefore VAS should not bear legal responsibility for Perez's injury. On appeal, we will not disturb that balancing of factors.

### 4.  *Sophisticated Users**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.  Negligence Per Se*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] Thus, in that regard CACI No. 1245 provides an incomplete and potentially misleading statement of the relevant law.

*See footnote, *ante*, page 658.

686

## DISPOSITION

The judgment in favor of respondent is affirmed. Respondent shall recover its costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.

On September 17, 2010, the opinion was modified to read as printed above.